## MARY BRUTTOMESSO ET AL. *v.* NORTHEASTERN CONNECTICUT SEXUAL ASSAULT CRISIS SERVICES, INC.
### (SC 15646)

Callahan, C. J., and Borden, Norcott, Katz and McDonald, Js.

Argued May 30—officially released July 22, 1997

1

*John E. Nimlo*, with whom, on the brief, was *Richard E. Joaquin*, for the appellants (plaintiffs).

*Joseph B. Curran*, for the appellee (defendant).

*Opinion*

KATZ, J. The dispositive issue in this appeal is whether a sexual assault crisis center that provides counseling to victims of sexual assault or abuse is a "health care provider" within the meaning of General Statutes § 52-190a.[1] We conclude that because neither

---

[1] General Statutes § 52-190a provides: "Prior reasonable inquiry and certificate of good faith required in negligence action against health care provider. (a) No civil action shall be filed to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. The complaint or initial pleading shall contain a certificate, on a form prescribed by the rules of the superior court, of the attorney or party filing the action that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each named defendant. For purposes of this section, such good faith may be shown to exist if the claimant or his attorney has received a written opinion, which shall not be subject to discovery by any party except for questioning the validity of the certificate, of a similar health care provider as defined in section 52-184c, which similar health care provider shall be selected pursuant to the provisions of said section, that there appears to be evidence of medical negligence. In addition to such written opinion, the court may consider other factors with regard to the existence of good faith. If the court determines after the completion of discovery, that such certificate was not made in good faith and that no justiciable issue was presented against a health care provider that fully cooperated in providing informal discovery, the court upon motion or upon its own initiative, shall impose upon the person who signed such certificate,

the defendant, Northeastern Connecticut Sexual Assault Crisis Services, Inc., a corporation organized and existing under the laws of the state of Connecticut,[2] nor its employees is licensed or certified by the department of public health,[3] the defendant does not fall within the statutory definition and, consequently, the plaintiffs cannot rely upon the extension of the statute of limitations provided by § 52-190a (b) to save their action, which was brought beyond the two year limitation of General Statutes § 52-584,[4] from being time barred.

The plaintiffs have set forth the following allegations in their complaint. The named plaintiff, Mary Bruttomesso, is the natural mother and next friend of the plaintiffs T, G and C, all of whom are minors (minor

---

a represented party or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee. The court may also submit the matter to the appropriate authority for disciplinary review of the attorney if the claimant's attorney submitted the certificate.

"(b) Upon petition to the clerk of the court where the action will be filed, an automatic ninety-day extension of the statute of limitations shall be granted to allow the reasonable inquiry required by subsection (a) of this section. This period shall be in addition to other tolling periods."

[2] Connecticut Sexual Assault Services, Inc., is an umbrella organization that supervises the various individual rape crisis centers throughout the state, including the defendant.

[3] Prior to July 1, 1995, the department and commissioner of public health were referred to as the department and commissioner of public health and addiction services. See Public Acts 1995, No. 95-257, §§ 12, 21, 58.

[4] General Statutes § 52-584 provides: "Limitation of action for injury to person or property. No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

plaintiffs).[5] Following incidents involving the minor plaintiffs that led to the arrest and imprisonment of Darrell Spencer for sexual assault in the first and second degree and risk of injury to a child, Bruttomesso sought counseling for the minor plaintiffs with the defendant. The defendant, through its agent and employee, Rene Suprenat, also counseled Spencer while he was incarcerated awaiting trial at the Brooklyn Correctional Center in Brooklyn. During the course of those counseling services, Suprenat established a relationship with Spencer and assisted him in the defense of the criminal charges against him and put up her personal residence as collateral, allowing him to post bond for his release. The minor plaintiffs learned of Spencer's release and, as a result, until the time that Spencer pleaded guilty and was reincarcerated, suffered constant fear, apprehension, anxiety, and emotional pain and stress. Furthermore, as a result of the defendant's alleged negligence and carelessness,[6] the minor plaintiffs were compelled to secure counseling with other therapists, which in turn delayed their recovery and caused them to incur additional treatment expense.

Along with their complaint, the plaintiffs provided, as required by § 52-190a (a), a certificate of reasonable inquiry that grounds existed for a good faith belief that the defendant's alleged negligence caused their injuries. Although this action was brought more than two years after Spencer's release, the plaintiffs received an extension of time pursuant to § 52-190a (b), which provides a ninety day extension to permit the reasonable inquiry necessary to obtain the foundation for this good faith

---

[5] In order to preserve the privacy of the minor plaintiffs, we do not use their full names.

[6] The plaintiffs alleged, inter alia, that the defendant: knew or should have known that there existed a conflict of interest in its counseling of Spencer and of his victims; failed to maintain proper guidelines so as to prevent such a conflict; failed to monitor Suprenat; improperly treated the minor plaintiffs; and violated the trust and confidence of the minor plaintiffs.

certificate. The plaintiffs rely on this extension to argue that their action is not time barred by § 52-584.

The defendant moved for summary judgment, claiming that the plaintiffs' action was time barred because the defendant is not a health care provider and, therefore, the plaintiffs could not avail themselves of the ninety day extension provided by § 52-190a (b). The trial court agreed and rendered judgment for the defendant. Thereafter, the plaintiffs appealed to the Appellate Court and the appeal was transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We conclude that the defendant is not a health care provider within the meaning of § 52-190a. Accordingly, we affirm the judgment of the trial court.

The defendant makes the same claim on appeal that it made in its motion for summary judgment: because it does not provide medical treatment, a rape crisis center is not a health care provider within the meaning of § 52-190a. The plaintiffs assert that the defendant is a health care provider under § 52-190a because it is "licensed," and, consequently, the action was brought in a timely manner and the trial court improperly granted the defendant's motion for summary judgment.

The standard of review for summary judgment is well established. "Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with

the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citation omitted; internal quotation marks omitted.) *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 202, 663 A.2d 1001 (1995); see also Practice Book § 384.

The plaintiffs do not contest that, in the absence of the savings clause of § 52-190a (b), the action was untimely. Therefore, the only issue before the trial court was whether the defendant was a health care provider within the meaning of § 52-190a. The trial court concluded that, as a matter of law, the defendant was not a health care provider because it was not a medical care provider. The plaintiffs concede that the defendant did not provide medical care but, nevertheless, they argue that the defendant is a health care provider because it was "licensed." Although such a claim might otherwise require consideration of facts as well as law, under the facts and circumstances of this case, there are no material facts in dispute. Therefore, the issue of whether the defendant was a health care provider is an appropriate matter for summary judgment.

The rules of statutory construction are well settled. "Because our fundamental objective in construing a statute is to ascertain and give effect to the apparent intent of the legislature; *Fleming* v. *Garnett*, 231 Conn. 77, 91–92, 646 A.2d 1308 (1994); *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994); we will not undertake an examination of [§ 52-190a] with blinders on regarding what the legislature intended [it] to mean. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). Accordingly, our analysis of [§ 52-190a] is not limited solely to the words of the statute. Instead, we must also

look . . . to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Doe* v. *Marselle*, 236 Conn. 845, 850, 675 A.2d 835 (1996).

"A thorough examination using all these factors is especially important in the present case because, although our initial guide [to interpreting a statute] is the language of the statute itself . . . the particular term in issue is a word of many meanings. ['Health care provider'] has been defined many ways, and the applicable definition often turns on the specific facts of the case and the context in which it is used. . . ."[7] Consequently, in construing its meaning, we are guided by the language of [§ 52-190a], both alone and in the context of [the cause of action], as well as the underlying legislative purpose of the harm at which it is directed." (Citations omitted; internal quotation marks omitted.) Id., 851.

Section 52-190a does not specifically define "health care provider." Although the trial court recognized that many other statutes expressly define the term; see footnote 7 of this opinion; it nevertheless confined its

---

[7] See, e.g., General Statutes § 19a-17b (1) (for purposes of peer review, " '[h]ealth care provider' means any person, corporation, limited liability company, facility or institution operated, owned or licensed by this state to provide health care or professional services, or an officer, employee or agent thereof acting in the course and scope of his employment"); General Statutes § 19a-581 (12) (for purposes of AIDS testing, " '[h]ealth care provider' means any physician, dentist, nurse, provider of services for the mentally ill or persons with mental retardation, or other person involved in providing medical, nursing, counseling, or other health care, substance abuse or mental health service, including such services associated with, or under contract to, a health maintenance organization or medical services plan"); and General Statutes § 19a-611 (4) (for purposes of office of health care access " '[h]ealth care provider' . . . means a state licensed or certified person or state-authorized facility, which delivers diagnostic, treatment, inpatient or ambulatory health care services").

inquiry to General Statutes § 52-184c because that provision is expressly referenced in § 52-190a (a) as follows: "[G]ood faith may be shown to exist if the claimant or his attorney has received a written opinion . . . of a similar health care provider as defined in section 52-184c . . . ."[8] By relying solely on that statute's defini-

---

[8] General Statutes § 52-184c provides: "Standard of care in negligence action against health care provider. Qualifications of expert witness. (a) In any civil action to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, in which it is alleged that such injury or death resulted from the negligence of a health care provider, as defined in section 52-184b, the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

"(b) If the defendant health care provider is not certified by the appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a 'similar health care provider' is one who: (1) Is licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications; and (2) is trained and experienced in the same discipline or school of practice and such training and experience shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.

"(c) If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a 'similar health care provider' is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider.'

"(d) Any health care provider may testify as an expert in any action if he: (1) Is a 'similar health care provider' pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be

tions of "similar health care provider," which utilize the terms "medical," "medicine" and "treatment or diagnosis," the trial court concluded that § 52-190a applies only to a medical professional whose business is the prevention, diagnosis or treatment of physical or mental illness. Because there was no claim that the plaintiffs received medical treatment for physical or mental illness from the defendant, the trial court held that, as a matter of law, § 52-190a did not apply to the plaintiffs' claim. Although we agree with the trial court that a rape crisis center is not a health care provider as envisioned by § 52-190a, we do so not because a rape crisis center does not provide medical services, but because it is not licensed by the state to provide the professional services it does offer. We leave for another day the issue of whether the term "health care provider" should be restricted to medical care providers.

In defining a cause of action against a health care provider, § 52-184c incorporates the definition of health care provider set forth in General Statutes § 52-184b, which, in turn, provides that a health care provider "is any person, corporation, facility or institution licensed by this state to provide health care or professional services . . . ."[9] In asserting that it is not a health care

---

as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim."

[9] General Statutes § 52-184b provides: "Failure to bill and advance payments inadmissible in malpractice cases. (a) For the purposes of this section, 'health care provider' means any person, corporation, facility or institution licensed by this state to provide health care or professional services, or an officer, employee or agent thereof acting in the course and scope of his employment.

"(b) The failure of a health care provider to bill a patient for services rendered shall not be construed as an admission of liability and shall not be admissible in evidence as to liability in any trial for malpractice, error or omission against a health care provider in connection with the provision of health care or professional services.

"(c) Any advance payment for medical bills by a health care provider or by the insurer of a health care provider shall not be construed as an admission of liability and shall not be admissible in evidence as to liability in any

provider under §§ 52-190a and 52-184c, the defendant recognizes that § 52-184b applies, but claims that it falls outside that provision's definition of a health care provider because, at the time of the plaintiffs' treatment, the defendant, as stated in the affidavit filed in support of the motion for summary judgment, was not *licensed* by the state to provide health care or professional services. The plaintiffs, relying on General Statutes § 19a-17, which is the disciplinary action statute governing professions under the jurisdiction of the department of public health, claim that the defendant *is* licensed because it is *certified.* Section 19a-17 (e) provides in relevant part that the definition of "license" includes *"certification by the [d]epartment of [p]ublic [h]ealth . . . ."* (Emphasis added.) Even if we were to agree with the plaintiffs that certification is sufficient to bring an entity under the definitional umbrella of § 52-184b, we nevertheless conclude that the defendant was not "certified" as envisioned by § 19a-17.

The plaintiffs' claim of certification rests upon General Statutes § 52-146k.[10] We conclude that their reliance

---

trial for malpractice, error or omission against a health care provider in connection with the provision of health care or professional services."

[10] General Statutes § 52-146k provides: "Privileged communications between battered women's or sexual assault counselor and victim. (a) As used in this section:

"(1) 'Battered women's center' means any office, shelter, host home or center offering assistance to battered women through crisis intervention, emergency shelter referral and medical and legal advocacy, and which meets the Department of Social Services criteria of service provision for such centers.

"(2) 'Battered women's counselor' means any person engaged in a battered women's center (A) who has undergone a minimum of twenty hours of training which shall include, but not be limited to, the dynamics of battering, crisis intervention, communication skills, working with diverse populations, an overview of the state criminal justice system and information about state and community resources for battered women, (B) who is certified as a counselor by the battered women's center which provided such training, (C) who is under the control of a direct service supervisor of a battered women's center, and (D) whose primary purpose is the rendering of advice, counsel and assistance to, and the advocacy of the cause of, battered women.

## is misplaced. To be considered a "rape crisis center" pursuant to § 52-146k, an office, institution or center

"(3) 'Confidential communication' means information transmitted between a victim of a battering or a sexual assault and a battered women's counselor or sexual assault counselor in the course of that relationship and in confidence by a means which, so far as the victim is aware, does not disclose the information to a third person other than any person who is present to further the interests of the victim in the consultation or any person to whom disclosure is reasonably necessary for the transmission of the information or for the accomplishment of the purposes for which such counselor is consulted, and includes all information received by, and any advice, report or working paper given or made by, such counselor in the course of the relationship with the victim.

"(4) 'Rape crisis center' means any office, institution or center offering assistance to victims of sexual assault and their families through crisis intervention, medical and legal advocacy and follow-up counseling and which meets the Department of Public Health criteria of service provision for such centers.

"(5) 'Sexual assault counselor' means any person engaged in a rape crisis center who (A) has undergone a minimum of twenty hours of training which shall include, but not be limited to, the dynamics of sexual assault and incest, crisis intervention, communication skills, working with diverse populations, an overview of the state criminal justice system, information about hospital and medical systems and information about state and community resources for sexual assault victims, (B) is certified as a counselor by the sexual assault center which has provided such training, (C) is under the control of a direct services supervisor of a rape crisis center, and (D) whose primary purpose is the rendering of advice, counseling and assistance to, and the advocacy of the cause of, victims of sexual assault.

"(6) 'Victim' means any person who consults a battered women's counselor or a sexual assault counselor for the purpose of securing advice, counseling or assistance concerning a mental, physical or emotional condition caused by a battering or a sexual assault.

"(b) On or after October 1, 1983, a battered women's counselor or a sexual assault counselor shall not disclose any confidential communications made to such counselor at any time by a victim in any civil or criminal case or proceeding or in any legislative or administrative proceeding unless the victim making the confidential communications waives the privilege, provided under no circumstances shall the location of the battered women's center or rape crisis center or the identity of the battered women's counselor or sexual assault counselor be disclosed in any civil or criminal proceeding. Any request made on or after October 1, 1983, by the defendant or the state for such confidential communications shall be subject to the provisions of this subsection.

"(c) When a victim is deceased or has been adjudged incompetent by a court of competent jurisdiction, the guardian of the victim or the executor

offering assistance to victims of sexual assault and their families through crisis intervention, medical and legal advocacy and follow-up counseling must meet the department of public health *criteria* of service provision for such centers. In defining the qualifications of a rape crisis counselor, the legislature imposed "certification" as a requirement. An employee of a rape crisis center "who (A) has undergone a minimum of twenty hours of training which shall include, but not be limited to, the dynamics of sexual assault and incest, crisis intervention, communication skills, working with diverse populations, an overview of the state criminal justice system, information about hospital and medical systems and information about state and community resources for sexual assault victims, (B) is *certified* as a counselor *by the sexual assault center which has provided such training*, (C) is under the control of a direct services supervisor of a rape crisis center, and (D) whose primary purpose is the rendering of advice, counseling and assistance to, and the advocacy of the cause of, victims of sexual assault" will be considered a sexual assault counselor. (Emphasis added.) General Statutes § 52-146k (a) (5).[11] This certification, however,

or administrator of the estate of the victim may waive the privilege established by this section.

"(d) A minor may knowingly waive the privilege established by this section. In any instance where the minor is, in the opinion of the court, incapable of knowingly waiving the privilege, the parent or guardian of the minor may waive the privilege on behalf of the minor, provided such parent or guardian is not the defendant and does not have a relationship with the defendant such that he has an interest in the outcome of the proceeding.

"(e) The privilege established by this section shall not apply: (1) In matters of proof concerning chain of custody of evidence; (2) in matters of proof concerning the physical appearance of the victim at the time of the injury; or (3) where the battered women's counselor or sexual assault counselor has knowledge that the victim has given perjured testimony and the defendant or the state has made an offer of proof that perjury may have been committed.

"(f) The failure of any party to testify as a witness pursuant to the provisions of this section shall not result in an inference unfavorable to the state's cause or to the cause of the defendant."

[11] We note that two counselors who were deposed testified that they *personally* were certified annually pursuant to § 52-146k.

the purpose of which is to extend an evidentiary privilege to communications between the counselor and the victim, although required by the statute, is conferred upon a counselor by a rape crisis center and not by the department of public health. The use of the different terms, "[d]epartment of [p]ublic [h]ealth criteria" and "certification by the sexual assault center," within the same statute suggests that the legislature "acted with complete awareness of their different meanings"; *Hartford Principals' & Supervisors' Assn.* v. *Shedd,* 202 Conn. 492, 506, 522 A.2d 264 (1987); and that it intended the terms to have different meanings. *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 613, 440 A.2d 810 (1981) (use of different terms within same sentence of statute "plainly" implies different meanings intended), on appeal after remand, 192 Conn. 252, 470 A.2d 1216 (1984); see also *Plourde* v. *Liburdi,* 207 Conn. 412, 416, 540 A.2d 1054 (1988). We conclude that the individual certification, which is not supplied by the department of public health itself, is insufficient to conclude that the defendant was "certified" under § 19a-17.

By expanding the term "license" to include "certification," the legislature expanded the disciplinary authority of boards and commissions established in the General Statutes under chapters 369 to 376, inclusive, 378 to 381, inclusive, and 383 to 388, inclusive, as well as of the department of public health with respect to professions under its jurisdiction that have no commission or board. See General Statutes § 19a-17.[12] Conse-

---

[12] General Statutes § 19a-17 provides in pertinent part: "Disciplinary action by department, boards and commissions. (a) Each board or commission established under chapters 369 to 376, inclusive, 378 to 381, inclusive, and 383 to 388, inclusive, and the Department of Public Health with respect to professions under its jurisdiction which have no board or commission may take any of the following actions, singly or in combination, based on conduct which occurred prior or subsequent to the issuance of a permit or a license upon finding the existence of good cause:

"(1) Revoke a practitioner's license or permit;

"(2) Suspend a practitioner's license or permit;

quently, in order for an organization to be "certified," the department of public health must exercise some authority over that agency. Such is not the case with the defendant. While the department of public health

"(3) Censure a practitioner or permittee;

"(4) Issue a letter of reprimand to a practitioner or permittee;

"(5) Place a practitioner or permittee on probationary status and require the practitioner or permittee to:

"(A) Report regularly to such board, commission or department upon the matters which are the basis of probation;

"(B) Limit practice to those areas prescribed by such board, commission or department;

"(C) Continue or renew professional education until a satisfactory degree of skill has been attained in those areas which are the basis for the probation;

"(6) Assess a civil penalty of up to ten thousand dollars; or

"(7) Summarily take any action specified in this subsection against a practitioner's license or permit upon receipt of proof that such practitioner has been:

"(A) Found guilty or convicted as a result of an act which constitutes a felony under (i) the laws of this state, (ii) federal law or (iii) the laws of another jurisdiction and which, if committed within this state, would have constituted a felony under the laws of this state; or

"(B) Subject to disciplinary action similar to that specified in this subsection by a duly authorized professional agency of any state, the District of Columbia, a United States possession or territory or a foreign jurisdiction. The applicable board or commission, or the department shall promptly notify the practitioner or permittee that his license or permit has been summarily acted upon pursuant to this subsection and shall institute formal proceedings for revocation within ninety days after such notification.

"(b) Such board or commission or the department may withdraw the probation if it finds that the circumstances which required action have been remedied.

"(c) Such board or commission or the department where appropriate may summarily suspend a practitioner's license or permit in advance of a final adjudication or during the appeals process if such board or commission or the department finds that a practitioner or permittee represents a clear and immediate danger to the public health and safety if he is allowed to continue to practice.

"(d) Such board or commission or the department may reinstate a license which has been suspended or revoked if, after a hearing, such board or commission or the department is satisfied that the practitioner or permittee is able to practice with reasonable skill and safety to patients, customers or the public in general. As a condition of reinstatement, the board or commission or the department may impose disciplinary or corrective measures authorized under this section. . . ."

may perhaps withhold funds from a rape crisis center; see General Statutes § 19a-112b;[13] or refuse to disseminate information to a rape crisis center that does not comply with its criteria; General Statutes § 19a-112c;[14] the plaintiffs have not pointed to, nor have we found, any statutes or regulations demonstrating the type of control over a center that is contemplated by § 19a-17.[15]

Our conclusion that the defendant is not covered by § 52-190a is in keeping with the legislative policies behind both §§ 52-190a and 52-584. *Petco Insulation Co.* v. *Crystal*, 231 Conn. 315, 321, 649 A.2d 790 (1994) (court required to read statute to effectuate intent of legislature). The purpose of the legislation is to inhibit a plaintiff from bringing an inadequately investigated cause of action, whether in tort or in contract, claiming negligence by a health care provider. Section 52-190a requires a certificate of good faith that the health care

---

[13] General Statutes § 19a-112b provides: "Services to victims of sexual acts. The Department of Public Health shall provide to victims of a sexual act constituting a violation of section 53-21, 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a, 53a-72b or 53a-73a, regardless of whether any person is convicted or adjudicated delinquent for such violation, the following services: (1) Counseling regarding human immunodeficiency virus and acquired immune deficiency syndrome; (2) HIV-related testing; and (3) referral service for appropriate health care and support services Such services shall be provided through counseling and testing sites funded by the Department of Public Health."

[14] General Statutes § 19a-112c provides: "Educational materials for sexual assault victims. The Department of Public Health shall work with the Connecticut Sexual Assault Crises Services, Inc. to develop educational materials about human immunodeficiency virus and acquired immune deficiency syndrome, specifically as they relate to sexual assault, for distribution to sexual assault victims through hospitals, rape crisis centers, HIV testing sites, the Division of Criminal Justice and other appropriate agencies. The materials shall include, but not be limited to, the following subjects: (1) The risks associated with HIV and sexual violence; (2) information about available testing options; (3) risk reduction information; and (4) referrals and information regarding rape crisis centers and HIV testing sites."

[15] Indeed, the primary purpose of the § 52-146k certification, upon which the plaintiffs' claim relies, is to allow the counselor to invoke confidentiality and not to ensure the quality of counseling.

provider had been negligent in the care and treatment of the plaintiff. The legislature recognized the additional time often required to obtain such a certificate and, therefore, provided the automatic ninety day extension of the statute of limitations. This extension constitutes a deviation from the statutory limitation in § 52-584, however, and although the legislature, in drafting § 52-190a, recognized the need for such deviation, in construing that statute we are guided by the principle that statutes must be read not to conflict with each other, but, rather, to form a coherent scheme. *In re Bruce R.*, 234 Conn. 194, 207, 662 A.2d 107 (1995). Therefore, in order not to conflict with the time limitations of § 52-584, any application of § 52-190a must follow the controlling definitions.

We recognize the significant role that rape crisis centers serve. They are often the first place a victim of sexual assault or incest will go for advice and counseling regarding the medical and legal issues they face and for assistance in handling the aftermath of such an attack. The legislature has also recognized the important role such centers play in this regard, as they are often the *only* place to which a victim of battery or sexual assault will turn. See General Statutes §§ 19a-112b and 19a-112c; see also General Statutes § 19a-112a (representative of Connecticut Sexual Assault Crisis Services, Inc., is one of thirteen members of commission appointed to design sexual assault evidence collection kit, thereby enabling good medical care and ensuring efficacy of any subsequent legal prosecution); General Statutes § 17b-407 (sexual assault counselor or battered women's counselor as defined in section § 52-146k must report abuse of nursing home patient or resident); and General Statutes § 17a-101 (b) ("[t]he following persons shall be mandated reporters . . . any person who is a sexual assault counselor or a battered women's counselor as defined in section 52-146k"). Such recognition

does not serve, however, to transform a rape crisis center into a health care provider pursuant to § 52-190a.

The judgment is affirmed.

In this opinion the other justices concurred.